IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
SOUTHERN DIVISION

| | |
|---|---|
| IN THE MATTER OF THE APPLICATION OF THE UNITED STATES OF AMERICA FOR A WARRANT AUTHORIZING THE TRACKING OF A GRAY 2008 FORD FUSION, CALIFORNIA LICENSE PLATE 6BHYO88, V.I.N. 3FAHP08138R149838 | No.<br><br>(UNDER SEAL) |

## AFFIDAVIT IN SUPPORT OF APPLICATION FOR TRACKING WARRANT

I, Jason R. Carter, a Task Force Officer (TFO) with the Drug Enforcement Administration (DEA), being first duly sworn, hereby depose and state as follows:

### INTRODUCTION AND AGENT BACKGROUND

1. I have been a sworn law enforcement officer for over six years. I have been assigned as a TFO with the DEA's Springfield, Missouri, Resident Office for approximately one year and four months. I have received specialized training relating to the manufacture, distribution, and possession with intent to distribute controlled substances. Based upon my training and experience, I have extensive knowledge of complex illegal drug manufacturing and distribution operations. I have conducted several investigations and assisted in the issuance and execution of numerous search warrants related to drug crimes.

2. I am an investigative or law enforcement officer of the United States within the meaning of Section 2510(7) of Title 18, United States Code, and I am empowered by law to conduct investigations and to make arrests and seizures for offenses enumerated in the Controlled Substances Act, Title 21, United States Code.

3. Upon my information and belief, a gray 2008 Ford Fusion, California license plate 6BHYO88, V.I.N. 3FAHP08138R149838 (hereinafter the Target Vehicle) is being utilized by

Breanna LENTEN in connection with the commission of ongoing violations of Title 21, United States Code, Sections 841(a)(1) and 846 (possession with the intent to distribute and/or distribution of controlled substances and conspiracy to distribute controlled substances), and Title 18, United States Code, Sections 1956(a)(1)(b)(i) and 1956(h) (concealment money laundering and money laundering conspiracy) by LENTEN and others, known and unknown. The Target Vehicle is registered to Jason Paul Lenten or Breanna Renee LENTEN.

4. I submit this affidavit in support of the attached application for a warrant authorizing the installation and monitoring of a mobile tracking device in, or on, the Target Vehicle. There is probable cause to believe that the installation and monitoring of a mobile tracking device in, or on, the Target Vehicle, will lead to evidence, instrumentalities, and fruits of the distribution of controlled substances and money laundering, as well as the identification of individuals who are engaged in the commission of those and related crimes.

5. The information contained in this affidavit is based on my personal knowledge and investigation, source debriefings, a controlled methamphetamine delivery, records, and information provided to me by other law enforcement agents involved in the investigation of this case. This affidavit contains the facts necessary to establish probable cause to track the Target Vehicle. Not all of the facts known to me about this investigation have been included.

6. Through my investigation, John MARTINEZ of Sacramento, California, has been identified as the source of supply for multiple pound shipments of methamphetamine to Southwest Missouri. MARTINEZ uses his Facebook account and cellular telephone to communicate about the distribution of methamphetamine and uses MoneyGram services, a local credit union, and the United States Postal Service to move drug proceeds back to California.

7. The investigation into MARTINEZ's activities began on October 4, 2016, when the Missouri State Highway Patrol (MSHP) Troop D Special Weapons and Tactics executed a state search warrant at 411 South Highland Street, Purcell, Jasper County, Missouri, based on information received from a confidential informant (CI).

8. The residence belonged to Christopher THOMPSON. THOMPSON was present when the warrant was executed and agreed to speak with law enforcement. THOMPSON stated that he used methamphetamine on a weekly basis and Daryl WESTON, who also resided at the search warrant location, supplied THOMPSON with the methamphetamine. THOMPSON denied any further involvement in the distribution of methamphetamine.

9. THOMPSON's cellular telephone was examined and, on his phone were two photos of United States Postal Service (USPS) Priority Mail Express labels, each with the same recipient address in California. MSHP Sergeant James Musche contacted United States Postal Inspection Service (USPIS) Inspector Matt Murrow and made him aware of the investigation and the Priority Mail packages.

10. On October 3, 2016, Inspector Murrow had been contacted by Purcell, Missouri, USPS employees regarding a suspicious package with tracking number ending in 1664 (the same tracking number depicted in one of the photographs found on THOMPSON's telephone). The USPS employees reported that the man who mailed the parcel had not put a return address on the parcel, but only a name. The employees recognized the man and knew that the name he put on the return address, "Randy Sigers," was not the sender's name. The USPS employees also recognized the recipient address on the package as the same address that was on a different package sent by another individual previously. The man mailing the current packages told the USPS employees the package contained "welding rods."

3

11. Inspector Murrow contacted a representative at the Sacramento, California, Post Office and requested that the package with tracking number ending in 1664 be intercepted and returned to Springfield, Missouri. Inspector Murrow received the package on October 5, 2016.

12. Later, Inspector Murrow was contacted by an employee of the Sacramento, California, Post Office who advised that someone identifying himself as "John MARTINEZ" had called to ask about the package and left his phone number. Inspector Murrow called the phone number, but no one answered, so he left a message.

13. On October 7, 2016, MARTINEZ called Inspector Murrow and told him that the package contained money for a truck that had been purchased from him by a man in Missouri. MARTINEZ told Inspector Murrow that the man already had the truck. Inspector Murrow asked if the man's name was Randy Sigers. MARTINEZ told Inspector Murrow that he did not know anyone named Sigers and gave Murrow permission to search the package. Inspector Murrow opened the package and found $8,980 in United States currency, packaged in two bundles of folded bills, wrapped in black paper, and concealed inside a plastic container with welding rods.

14. Several minutes after the call with MARTINEZ ended, MARTINEZ called back and explained that he was a confidential informant (CI) for an investigator in California. MARTINEZ stated he was not worried about the money, but he needed the individuals in Missouri to go to California because they were supposed to bring a load of firearms. MARTINEZ said that because Inspector Murrow had seized the money, the individuals were too scared to take the guns to California. Inspector Murrow told MARTINEZ to have the investigator MARTINEZ was working for in California call him. The investigator never called Inspector Murrow. In November of 2016, Sergeant Musche did confirm that MARTINEZ was working as a CI for a local drug task force out of Yolo County, California. Sergeant Musche told the contact in Yolo County about his investigation

in Missouri, and the contact there did not advise Sergeant Musche that MARTINEZ's work as a CI involved him sending methamphetamine to Missouri.

15. On December 30, 2016, Sergeant Musche arrested Carrie PENATE pursuant to a felony warrant for possession of a controlled substance. In a post-arrest, post-*Miranda* interview, PENATE told Sergeant Musche that she knew MARTINEZ and grew up with him in California. About a year earlier, MARTINEZ had contacted her and her friend Kiley CARPENTER on Facebook. MARTINEZ wanted to meet CARPENTER, so in July of 2016, PENATE and CARPENTER traveled to California with Joel BELL, Lee WILLIAMS, and Katie BRUMMETT. After they returned from California, CARPENTER told PENATE that BELL was receiving methamphetamine from MARTINEZ in the mail and sending cash back to him.

16. On January 12, 2017, Sergeant Musche obtained a search warrant for a suspect package being shipped from West Sacramento, California, to Ashley Blair, 603 Cherry Street, Carl Junction, Missouri. Based on the ongoing investigation, Sergeant Musche believed MARTINEZ had shipped the package, and upon opening the package, Sergeant Musche found approximately eight (8) ounces of methamphetamine. A small bag containing a representative sample of the methamphetamine was left in the package and the package was released to Ozark Drug Enforcement Taskforce (ODET) Taskforce Officer (TFO) Chad Allison for a controlled delivery to 603 Cherry Street.

17. Later that day, TFO Allison approached the front door of 603 Cherry Street and knocked on the door. The door was opened by a white female, later identified as Jessica PALMER. TFO Allison asked PALMER if she was Ashley Blair, and she stated she was. TFO Allison requested PALMER sign a FedEx package receipt form and she did so. PALMER took custody of the box that contained a representative sample of methamphetamine and went back inside the trailer. A few moments later, a search warrant was served on the residence and PALMER was arrested.

18. During a post-arrest interview, PALMER stated she signed Ashley Blair's name on the package receipt form and that Blair was not involved, but that she paid Blair for letting her use her house to receive the package. PALMER told investigators the methamphetamine was supplied by MARTINEZ. PALMER had never met MARTINEZ and did not know if that was his real name.

19. PALMER stated that over the past few weeks she received three packages containing methamphetamine, including the one from earlier that day. The two previous packages MARTINEZ sent to PALMER each contained four ounces of methamphetamine, and PALMER had sold and/or used all the methamphetamine that she had received.

20. PALMER said that MARTINEZ had originally contacted her via Facebook Messenger, but she did not know how MARTINEZ got her name. MARTINEZ told her that he would send her methamphetamine if PALMER would send him money, but PALMER had to send half of the money up front before MARTINEZ sent the first package. MARTINEZ would send PALMER the tracking number for the packages he was sending.

21. PALMER also paid money or methamphetamine to friends of hers whom she recruited to send money to MARTINEZ. PALMER had people send MoneyGrams from Wal-Mart or go to a credit union to deposit money into MARTINEZ's account. PALMER said she had been to the credit union a couple times and had taken people there to deposit money.

22. Sergeant Musche learned that several individuals were specifically using Joplin Metro Credit Union to make cash deposits of drug proceeds generated from the methamphetamine supplied by MARTINEZ.

23. Sergeant Musche contacted employees at Joplin Metro Credit Union and obtained a list of individuals who had made deposits into a "shared branch" account with Golden 1 Credit Union

owned by MARTINEZ. A shared branch account allows deposits and withdrawals to be made at affiliated credit unions that are members of that particular network.

24. A total of $49,019 in cash deposits were made at Joplin Metro Credit Union into MARTINEZ's account with Golden 1 Credit Union between August 10, 2016, and February 13, 2017. One of the earliest depositors was BELL, who made deposits on August 15, 2016, of $200, and on August 25, 2016, of $1,000, which was consistent with the timeframe of after BELL returned from California with PENATE and CARPENTER. THOMPSON, whose residence was where the October 4, 2016, warrant was executed, also made deposits on September 7, 2016, and September 23, 2016.

25. The same records show that LENTEN has made five deposits at Joplin Metro Credit Union for the benefit of MARTINEZ's account at Golden 1 Credit Union. On February 3, 2017, in two separate deposits, LENTEN deposited $1,200 cash and $1,130 cash. On February 4, 2017, LENTEN deposited $1,350 cash. On February 11, 2017, LENTEN deposited $1,400 cash. On March 4, 2017, LENTEN deposited $1,280 cash.

26. Joplin Metro Credit Union surveillance photos showed that LENTEN was driving the Target Vehicle on all four dates when the deposits were made.

27. On February 28, 2017, Sergeant Musche interviewed Craig WHITTINGTON at the Jasper County Jail in Carthage, Missouri. WHITTINGTON stated he was involved in the distribution of large quantities of methamphetamine and was currently working with Daniel VALLEJO. WHITTINGTON claimed MARTINEZ was the source of supply for the methamphetamine. Joplin Metro Credit Union had previously provided information on deposits to MARTINEZ's account at Golden 1 Credit Union by VALLEJO. On February 13, 2017, VALLEJO deposited $500 cash. On February 17, 2017, VALLEJO deposited $250 cash. On February 21, 2017, VALLEJO deposited

$1,650 cash. On February 23, 2017, VALLEJO deposited $1,700 cash. On February 24, 2017, VALLEJO deposited $1,700 cash.

28. WHITTINGTON informed Sergeant Musche that recently, two females have been transporting methamphetamine supplied by MARTINEZ from Sacramento, California, to Joplin, Missouri. The two females drive a gray, Ford, four-door vehicle with California registration. WHITTINGTON stated both females were originally from Sacramento, California.

29. Based on the facts set forth above, there is probable cause to believe that the Target Vehicle has been and will continue to be used in violation of Title 21, United States Code, Sections 841(a)(1) and 846 (possession with the intent to distribute controlled substances and/or distribution of controlled substances and conspiracy to distribute controlled substances) and Title 18, United States Code, Sections 1956(a)(1)(b)(i) and 1956(h) (concealment money laundering and money laundering conspiracy).

30. In order to track the movement of the Target Vehicle effectively, your affiant seeks to place a mobile tracking device in or on the Target Vehicle while it is in the Western District of Missouri.

31. The ongoing investigation in this matter would be jeopardized if the target or others had knowledge of the tracker. Due to concerns about detection of officers when they install the tracking device, I am requesting that agents be permitted to install the device at any time of the day or night. Furthermore, the batteries for the tracking device will need to be periodically maintained, which will require removing the device, recharging or replacing the batteries, and reattaching the device within the 45-day period of the warrant. Due to the same concerns about detection, I am requesting that agents be permitted to remove and reattach the device at any time of the day or night. It may also be necessary to enter the Target Vehicle to effect the installation of the tracking device in a manner that will keep it from being easily detected

32. In the event the Court grants this application, there will be periodic monitoring of the mobile tracking device during both daytime and nighttime hours for the next 45 days. In addition, the mobile tracking device may produce signals from inside private garages or other such locations not open to public or visual surveillance.

33. Given the ongoing nature of this investigation, immediate notification of this warrant will have an adverse result. Accordingly, delayed notice of 30 days is requested under 18 U.S.C. § 3103a.

34. Based on the same concerns that knowledge of the investigation would jeopardize its effectiveness, I request that this affidavit, the application for the warrant, the warrant as well, and any other related documents be sealed.

WHEREFORE, your affiant respectfully requests that the Court issue an order authorizing members of the DEA Springfield Resident Office, or their authorized representatives, including but not limited to other law enforcement agents and technicians assisting in the above-described investigation, to install a mobile tracking device in or on the Target Vehicle; to surreptitiously enter the Target Vehicle to effect said installation; and to monitor the signals from the tracking device for a period of time not to exceed 45 days following the issuance of the Court's order, including signals produced from inside private garages and other locations not open to the public or visual surveillance,

and signals produced in the event that the Target Vehicle leaves the Western District of Missouri, but remains within the United States.

Further your affiant sayeth naught.

*[signature]*

Jason R. Carter
Officer/Task Force Officer
Springfield Police Department
Drug Enforcement Administration

Subscribed and sworn to before me in my presence on this **9th** day of March, 2017.

*[signature]*

David P. Rush
United States Magistrate Judge